**FILED**

AO 91 (Rev. 11/11) Criminal Complaint

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

AUG 2 5 2017

MATTHEW J. DYKMAN
CLERK

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 17-2292-CBD |
| Dawn J. Bennett | ) | |
| | ) | 17mj2217 |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____December 2014 to July 2017_____ in the county of _____Montgomery_____ in the

_____ District of _____Maryland_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1343; § 1344; § 1014 | Wire Fraud; Bank Fraud; False Statements in Relation to Loan and Credit Application. |

This criminal complaint is based on these facts:

See Affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

SA Keith A. Custer/FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____Aug 24, 2017_____

_____
*Judge's signature*

City and state: _____Greenbelt, Maryland_____     Charles B. Day, United States Magistrate Judge
*Printed name and title*

BBP/TPW: USAO 2016R00037

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. _17-2292- CBD_ |
| v. | ) | |
| | ) | |
| DAWN J. BENNETT, | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant | ) | |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

Your Affiant, Keith A. Custer, being first duly sworn, deposes and states as follows:

### INTRODUCTION

1.       I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice. I have been employed by the FBI for approximately ten years, during which time I have been assigned to the Baltimore Division. I am currently assigned to a white collar crime squad. I have received instruction and training, along with investigative experience in securities fraud, mortgage fraud, financial institution fraud, healthcare fraud, and money laundering. In addition, I have received training in computer forensics and electronic mail ("email") analysis. In the course of conducting or participating in criminal investigations, I have been involved in interviewing and debriefing witnesses and informants; conducting physical surveillance; analyzing bank records and other financial documents; analyzing telephone records; collecting and analyzing evidence; and preparing and executing search warrants, including search warrants for email accounts.

2.       I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other law enforcement officers relating to this investigation. The information set forth in this affidavit is based on my own observations and review of documents, or reliable information provided to me

by other law enforcement personnel. I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested search warrants. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

3.    This affidavit is being submitted in support of an arrest warrant for **DAWN J. BENNETT ("BENNETT")**. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that **BENNETT** has committed violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1014 (false statements in relation to loan and credit applications).

## CASE BACKGROUND AND OVERVIEW

4.    In December 2015, the Baltimore Division of the FBI was contacted by representatives from the Philadelphia Regional Office of the Securities and Exchange Commission ("SEC") Enforcement Division regarding potential criminal acts being committed by **BENNETT**, a registered investment advisor ("RIA"). On September 9, 2015, the SEC issued a press release in which they announced charges against **BENNETT** for allegedly inflating both the amount of assets under management by her firm, Bennett Group Financial Services ("BGFS"), and the investment returns obtained by BGFS. The SEC alleged that this took place on **BENNETT**'s paid weekly radio program, titled "Financial Myth Busting with Dawn Bennett," which began airing on AM radio in Maryland and Washington, D.C., in 2010. During the course of their investigation, the SEC was alerted to potential criminal activity unrelated to the September 2015 charges, which the SEC brought to the FBI's attention.

5.    Specifically, the SEC was contacted by a representative from Old Line Bank ("OLB") in Waldorf, Maryland regarding one of Old Line Bank's clients, Individual #1.

2



Individual #1 is an 80 year-old female from Maryland. The OLB representative advised the SEC

that Individual #1 went to her local branch to conduct a wire transfer for a proposed investment.

As a precaution, OLB asked Individual #1 for supporting documentation related to the proposed

investment. Individual #1 provided OLB with a document titled "DJ BENNETT HOLDING,

LLC, SECURE CONVERTIBLE NOTE FINANCING, SUMMARY OF TERMS." This

document was dated October 20, 2015, and was signed by Individual #1 on October 27, 2015,

using the title "Investor," and was also signed by **BENNETT** on October 30, 2015 using the title

CEO, DJBENNETT.COM. The amount to be invested was $32,300. A review of the summary

of terms found that **BENNETT** was purporting to raise funds for DJ BENNETT HOLDING,

LLC, and was offering an annual interest rate of 15% via secured convertible promissory notes.

The summary of terms document further stated that "the proceeds of the Notes will be used for

prototype and product development, patent filings, engineering services and other operating

expenses." On the signature page, directly underneath the signature section, were wiring

instructions, directing funds to be wired to account XXXXXXX2861 at First Republic Bank

(hereafter "FRB 2861") in San Francisco, California, in the name DJB Holding LLC. Below the

wiring instructions was a paragraph titled "Risks of Investing in this investment," which stated

the following:

> *Investing in this offering involves a high degree of risk. Securities sold through this*
>
> *offering are typically not publicly traded and, therefore, are less liquid.*
>
> *Additionally, companies seeking investments like this offering tend to be in earlier*
>
> *stages of development and have not yet been fully tested in the public marketplace.*
>
> *Investing in this offering requires high risk tolerance, low liquidity concerns, and*
>
> *long-term commitments. Investors must be able to afford to lose their entire*



*investment. Investment products are not FDIC insured, may lose value, and there*

*is no bank guarantee.*

OLB was concerned that this investment was not appropriate for an investor of Individual #1's

age. OLB conducted preliminary research on **BENNETT** and located the September 2015 SEC

Enforcement Division press release, which aroused OLB's suspicions and led OLB to contact the

SEC.

6.      **BENNETT** has been aware that she was under some form of investigation

beginning as early as December 10, 2014, when she gave sworn testimony to the Financial

Industry Regulatory Authority ("FINRA"),[1] Department of Enforcement, related to the matters

that were later charged by the SEC. **BENNETT** was represented at this examination by

Attorney #1 from Law Firm #1, which is based in New York City, New York.

## DJBENNETT.COM

7.      During the December 10, 2014, FINRA interview, **BENNETT** briefly discussed

DJ Bennett Holding LLC and DJBennett.com, which, according to Individual #1's DJ

BENNETT HOLDING, LLC, SECURE CONVERTIBLE NOTE FINANCING, SUMMARY

OF TERMS document, were to be the beneficiaries of investor money wired to the FRB 2861

account. In the statement to FINRA, **BENNETT** described DJBennett.com as an internet

retailing website for luxury sportswear. A review of the transcript found that **BENNETT** stated

under oath that she was the 100% owner of DJ Bennett Holding LLC/DJBennett.com and that it

---

[1] FINRA is not a government agency. It is an independent, not-for-profit organization,
authorized by Congress to, among other things, write and enforce rules governing the activities
of securities firms and brokers, and examine firms for compliance with those rules. Based on its
investigations, FINRA can make referrals to the SEC and other government agencies, and share
the results of its investigations as appropriate.



was a completely separate entity from BGFS, although the physical office spaces were co-located in office space in Washington, D.C.

### ANALYSIS OF DJBENNETT.COM OPERATING ACCOUNT 2014-2015

8.    After receiving the tip from OLB, the SEC requested records from First Republic Bank to determine if other investors were being solicited in the same manner as Individual #1. These records were produced to the SEC, which made them available to the FBI for financial analysis. A review of the FRB 2861 account statements found that, between December 17, 2014 and October 29, 2015, 28 individuals deposited a total of $5,780,457.10 into the FRB 2861 account. The deposits began just one week after **BENNETT**'s initial interview with FINRA. Despite the language in the DJ BENNETT HOLDING, LLC, SECURE CONVERTIBLE NOTE FINANCING, SUMMARY OF TERMS document provided by Individual #1, analysis of the FRB 2861 account found activity consistent with a Ponzi scheme and misappropriation of investor funds. Based on my training and experience, a Ponzi scheme is a fraudulent investment scheme where the operator of the scheme solicits investors by promising high rates of return with little risk. The scheme operator then funds payments to the older investors through funds obtained through new investors. Typically, the operator of the scheme will use investment funds for purposes other than what was conveyed to the investors. For example, funds may be used for the personal benefit of the scheme operator.

9.    Specifically, the chronologically first investor victim, Individual #2, made a wire transfer to the FRB 2861 account on December 17, 2014, in the amount $250,000 with the note "loan for friend." Subsequently, in February and March 2015, eight other individuals made deposits into the FRB 2861 account, in large dollar amounts ranging between $5,000 and $190,000, totaling $711,000. On April 1, 2015, the chronologically first investor, Individual #2,



received a wire transfer from the FRB 2861 account in the amount of $300,000, which represents a return of 20% on the initial loan over a period of less than 4 months. Only two other individuals out of the 28 that deposited funds to the FRB 2861 account were repaid in full and none at this rate of return.

10.      According to account opening documents provided by First Republic Bank, the FRB 2861 account was opened in January 2010 in the name DJB Holding LLC, and **BENNETT** was listed as the only managing member of the LLC, which was a Delaware company. **BENNETT** was listed as the sole signer on the account, although another individual was listed as an individual authorized to conduct transactions. In December 2014, when **BENNETT** provided testimony to FINRA, she stated that the other individual was no longer associated with **BENNETT** or her firms. This left **BENNETT** as the sole individual authorized to conduct transactions for the FRB 2861 account. Based on my review of the records, it appears that **BENNETT** was the only individual who was conducting transactions on the FRB 2861 account after December 2014.

11.      From the time of the account opening, continuing through 2014, the FRB 2861 account appeared to function mostly as an operating account for an internet retail business. Beginning in 2013, the business appeared to enter into agreements with a series of financing companies to sell or "factor" its receivables. This was confirmed through the FINRA interview of Employee #1, a longtime employee and associate of **BENNETT**, who provided sworn testimony on November 13, 2015. Through knowledge, training and experience, I know that the factoring of a company's receivables is frequently an indicator of financial stress for a business or individual. Beginning in February 2015, the FRB 2861 account frequently became overdrawn, resulting in numerous bank fees, and the account balance was often less than $1,000.

6



In many cases, this low account balance provided specific visibility into how victim investor funds were used after being deposited.

12.    For example, on April 21, 2015, the account balance for the FRB 2861 account was $88.67. The next day, on April 22, 2015, a wire transfer from Individual #3 in the amount of $230,000 was received. On the same day, a wire transfer for $200,000 was sent from the FRB 2861 account to an account in the name of Law Firm #2, which your Affiant knows to be a prominent law firm in Washington D.C. that was representing **BENNETT** during the FINRA and SEC investigations in 2015.

13.    Additionally, Individual #3 sent a second wire transfer to the FRB 2861 account on July 9, 2015, in the amount of $150,000. At the time, the account balance for the FRB 2861 account was $152.42. The following day, a wire transfer in the amount of $150,000 was sent from the FRB 2861 account to an account in the name "Cowboys Stadium LP." Records provided by the Cowboys Stadium LP showed that DAWN J. **BENNETT** had entered into a personal 20-year agreement to lease suite 242 on the Hall of Fame level of the Dallas Cowboys football stadium for an annual lease fee of $500,000. This agreement was executed on November 19, 2007, and officially began with the 2009 football season. Records provided by Cowboys Stadium LP showed that **BENNETT** still owed $300,000 from the 2013 season when the 2014 lease payment was invoiced on September 11, 2014. This corresponds with the approximate time that **BENNETT** began factoring her receivables for the DJBennett.com business. Open source searches found several news media reports that referenced a now-settled lawsuit which was filed by the Dallas Cowboys against **BENNETT** in late 2014 seeking a total of $7.3 million as compensation for **BENNETT**'s non-payment of her luxury suite lease at Cowboys Stadium. Correspondence provided to the FBI by Cowboys Stadium LP shows that

7



BENNETT emailed the Dallas Cowboys general counsel on March 20, 2015, asking that "the filing against me (be) removed/pulled/withdrawn as soon as possible." BENNETT continued, explaining that her "job responsibilities require security clearance as well as working with regulatory groups all of which, since this stories [sic] release in the press/internet has been in jeopardy. Thus, I have tremendous pressure and great concern for my livelihood that is now in risk."

14.     According to analysis of the FRB 2861 account and records provided by Cowboys Stadium LP, between December 17, 2014 and July 14, 2015, Cowboys Stadium LP received $1,060,000 from BENNETT, all by wire transfers from the FRB 2861 account. These payments brought BENNETT back into good standing on her stadium suite lease for 2013, 2014, and 2015. Other payments to the Cowboys Stadium LP appeared to be sourced from potential victim investor funds, similar to the July 10, 2015 wire transfer funded by Individual #3 described above. For example, on June 24, 2015, a $500,000 wire transfer was credited to the FRB 2861 account, which at the time had a balance of $16,868.07. The wire transfer was sent by Individual #4 and Individual #5, aged 71 and 70 respectively, both of whom resided in Maryland. Over the following week most of the deposited funds were disbursed as follows:

| Date | Transaction | Amount ($) | Account Balance ($) |
|------|-------------|------------|---------------------|
| 6/24/2015 | DEPOSIT-WIRED FUNDS INDIVIDUAL 4 AND INDIVIDUAL 5 | 500,000 | 516,868.07 |
| 6/26/2015 | ACH DEBIT AMEX EPAYMENT -ACH PMT | (17,297.71) | 499,570.36 |
| 6/29/2015 | DOMESTIC WIRE FUNDS-DEBIT DJBENNETT SINGAPORE | (25,000.00) | 474,570.36 |
| 6/29/2015 | DOMESTIC WIRE FUNDS-DEBIT DJB HOLDINGS ,LLC | (25,000.00) | 449,570.36 |
| 6/29/2015 | DOMESTIC WIRE FUNDS-DEBIT --- Law Firm #3 ACCOUNT | (100,000) | 349,570.36 |
| 6/30/2015 | ACH DEBIT AMEX EPayment/ACH PMT ID W6926 | (16,851.96) | 332,718.40 |
| 6/30/2015 | ACH DEBIT BARCLAYCARD US/CREDITCARD ID 307023396 | (74,680.47) | 258,037.93 |



| 6/30/2015 | DOMESTIC WIRE FUNDS-DEBIT COWBOYS STADIUM LP | (200,000.00) | 58,037.93 |
|---|---|---|---|

As is shown above, the $500,000 supplied by Individual #4 and Individual #5 on June 24, 2015, were used for a $200,000 payment to Cowboys Stadium LP six days later, on June 30, 2015. In addition, on June 29, 2015, a wire transfer for $100,000 was sent from the FRB 2861 account to an account in the name of Law Firm #3, which I know to be a large law firm with offices in Washington, D.C.

15.     **BENNETT**'s final payment to Cowboys Stadium LP, which returned her to good standing on her stadium suite lease, was a wire transfer in the amount $150,000 from the FRB 2861 account to Cowboys Stadium LP on July 14, 2015. As with the other payments described above, this wire transfer to Cowboys Stadium LP was completed immediately following the receipt of two wire transfers from Individual #6 (another presumed victim investor) in the amounts of $52,000 and $120,000. These wire transfers were received on the same day as the payment to Cowboys Stadium LP. Prior to Individual #6's deposits, the account balance was just $4,742.63.

16.     **BENNETT** continued to use funds apparently sourced from individual investors to fund her legal expenses. For example, on October 21, 2015, the account balance in the FRB 2861 account was $1,978.29. On October 22, 2015, a wire in the amount of $120,000 was deposited into the FRB 2861 account from Individual #7, a 64 year-old female from Maryland. The following day, a wire transfer in the amount of $100,000 was initiated from the FRB 2861 account to Law Firm #4, which I know to be a law firm that has represented **BENNETT** in her litigation with FINRA and the SEC. Between April 22, 2015, and October 29, 2015, wire transfers from the FRB 2861 account to law firms associated with **BENNETT** totaled $907,220.49, mostly funded by presumed victim investors.

9



## FINDINGS FROM EMAIL SEARCH WARRANT OF MAY 20, 2016

17.    I have reviewed records produced by Microsoft Corporation pursuant to a May

20, 2016, email search warrant covering DBENNETT@DJBENNETT.COM and <Employee

#1>@DJBENNETT.COM.  The search warrant production contained numerous emails in which

**BENNETT** communicated with victim investors about investing in DJBennett.com.  Some of

the investors were reluctant and declined at first, but later relented and decided to invest funds

with **BENNETT**.  For example, Individual #8, a 70 year old from Arizona, was initially solicited

by **BENNETT** in March and April 2015 but declined, explaining his rationale in two email

chains with **BENNETT** (emphasis below is mine):

> *__EMAIL CHAIN FROM MARCH 30, 2015__*
> *From: Dawn J Bennett <DBENNETT@DJBENNETT.COM>*
> *To: Individual #8*
> *Cc:*
> *Subject: RE: Individual #8, Attached is your fully codified NDA. I just left a vm for you so please call*
> *me. Thanks! Dawn*
> *Date: Mon Mar 30 2015 11:43:53 EDT*
>
> *I am sorry to hear your wife isn't getting better...she will be in my prayers.*
> *[Individual #8]...__because of your need for safety and guarantee and liquidity you need to call me__...do you have a*
> *moment, now, to speak?*
>
> *Dawn J. Bennett, CEO*
> *[address and contact numbers omitted]*
> *www.djbennett.com*
>
> *----Original Message----*
> *From: Individual #8*
> *Sent: Monday, March 30, 2015 11:31 AM*
> *To: Dawn J Bennett*
> *Subject: Re: Individual #8, Attached is your fully codified NDA. I just left a vm for you so please call me.*
> *Thanks!*
>
> *Dawn*
> *very strange. Sent that nearly a week ago, must have been sitting in cyber space some where! __had__*
> *__communicated with you as well our decision to not make the investment at this time__ but thanked you for*
> *thinking of us! __My wife is suffering more than ever (if imaginable!) and we simply have to manage__*
> *__matters without further risk these days not knowing what might be any increasing costs for her__*
> *__treatment and/or care.__ I wish you continued great things with your exciting "adjunct" business!*

10



*Cheers.*
*Individual #8*

**EMAIL CHAIN FROM APRIL 15, 2015**
*From: Dawn J. Bennett*
*<dbennett@bennettgroupfinancial.com>*
*To: Dawn J Bennett <DBENNETT@DJBENNETT.COM>*
*Cc:*
*Subject: FW: Offer*
*Date: Wed Apr 15 2015 11:20:29 EDT*
*Attachments:*
*-----Original Message-----*
*From: Individual #8*
*Sent: Wednesday, April 15, 2015 11:19 AM*
*To: Dawn J. Bennett*
*Subject: Offer*

*Dawn, we sincerely appreciate your consideration to offer us the opportunity to invest in your
remarkably successful company to date. We are torn and I will share the reason behind much of our
dilemma. One of my siblings who worked all his life at the extreme level of passion and dedication to his
discipline as you have, invested in what to him seemed was a sure deal in both returns and eventual
buy out. He lost everything with his investments into multi millions and subsequently his many assets
including numerous properties, etc. We have been in somewhat the middle of it all as he and his wife
live nearby us and our friendship has been close and meaningful. On top of everything [Investor #8's wife]
manages health-wise 24-7, it has been hell for us to witness the immensity of his losses on him both
tangibly and emotionally. To fast forward to our personal financial circumstances, as you know, we have
put ourselves in "interesting" professional positions while working for non profits, the last four years
working in a voluntary capacity while getting the museum developed. **What you are managing is our sole
security blanket. It would be a killer if for any reason an investment in your fine company would lead to
any more losses than what our portfolio has experienced in the recent past.** The way things are going I
will need to work until I kick the bucket in order to ensure that if [Individual #8's wife] were to out live me
in her greatly suffering condition her reliance on our accounts you are managing would be certainty. That
in a nut shell is our reality, with no violins necessary to be playing for us! **Our greatest concern, Dawn, is
for us to have you invest what we have in that one account we spoke of previously and for whatever
reason lose its principal. It would be devastating to us and at this stage of our lives and personal
circumstances, we would then have no way or time to rebound.** I hope you understand our predicament.
Again, your kindness in wanting for us to become beneficiaries of your anticipated increasing successes
is most appreciated.*
*Best always,*

*Individual #8*
*Sent from my iPhone*

18.      Analysis of the FRB 2861 account and the email search warrant records showed

that beginning in January 2016, **BENNETT** began directing victim investor deposits to

Monument Bank account #XXXXXX2678 ("MB 2678").  A review of account opening

documents provided by Monument Bank found that MB 2678 was opened on December 11,

2015, in the name DJB Holdings LLC DBA DJBennett.com, with DAWN J. **BENNETT** as the

11



sole signer on the account. A review of records for MB 2678 found that Individual #8 and his spouse made the following wires to **BENNETT**:

| Date | Amount ($) |
|------|-----------|
| 4/1/2016 | 100,000 |
| 4/4/2016 | 100,000 |
| 4/13/2016 | 175,000 |
| 4/18/2016 | 401,985 |
| 9/2/2016 | 25,000 |
| 9/7/2016 | 50,000 |
| Total | 851,985 |

19.     Analysis of MB 2678 found the following significant payments were made following Individual #8's deposits:

| Date | Payee | Amount ($) |
|------|-------|-----------|
| 4/4/2016 | Law Firm #4 | 150,000 |
| 4/4/2016 | Individual #9 | 11,250 |
| 4/13/2016 | CLPF CC Pavilion LP[2] | 175,000 |
| 4/19/2016 | Individual #10 | 16,875 |
| 4/19/2016 | Individual #11 | 36,896 |
| 4/19/2016 | Individual #12 | 3,750 |
| 4/19/2016 | Law Firm #4 | 150,000 |
| 4/19/2016 | Dawn Bennett | 20,000 |

The opening balance for MB 2678 on April 1, 2016, was $19,398.05. The deposits made by Individual #8 constituted over 92% of the deposits to MB 2678 with the remainder coming from two other victim investors ($60,000 total) compared with $776,985 deposited by Individual #8. As discussed above, I know Law Firm #4 to be a law firm representing **BENNETT** in litigation with FINRA and the SEC. Additionally, I have identified Individuals #9, #10, #11, and #12 as victim investors and the amounts above are consistent with interest payments for the promissory

---

[2] CLPF-CC Pavilion LP is the property owner for the BGFS office space (a portion of which is utilized by DJBennett.com) in Washington, D.C. Based on a review of records from CLPF-CC Pavilion LP, rent for the office space was approximately $71,170 per month in April of 2016.



notes these individuals have signed.  The $20,000 payment to **BENNETT** was a wire transfer to

a personal account held in the name of **BENNETT** at United Bank.

20.     On April 13, 2016, Individual #8 sent the email below email concurrent with his

wire of $175,000 to MB 2678, again laying out his circumstances in a lengthy email to

**BENNETT** (again, emphasis below is mine):

> From: Individual #8
> Date: April 13, 2016 at 7:14:21 AM MST
> To: Dawn Bennett <DBENNETT@DJBENNETT.COM>
> Subject: Re: Hi
>
> Ok. I am in therapy from 9 to 11 so immediately following I can do that with wiring instructions. Thank you! And, sometime soon when my wife is sharp enough by being awake late in the day or early evening to be party to a phone call with the two of us <u>on the matter of the IRA accounts and moving them your direction to achieve what you have so very generously described to me as late as yesterday when you learned our real financial circumstance</u>, etc., I would appreciate showing her our respect to have her feel she is part of the team to both understand the strategy for the next few years and thanks to you the extraordinary benefits derived accordingly. I have shared last night much what we spoke about but what I ask you to appreciate is that as sick as she is, and has been for over 30 years, depression is her Satan and impedes every aspect of her being and living. She is always, always as low as a snake because of this death of depression which honestly and understandably has been exasperated because of three different past employers who screwed us Royal to the point we have found us to be after our giving so much to humanity through the institutions we have directed in my career ... <lengthy discussion of Individual #8's professional career omitted>
>
> But, it is cause, along with others preceding, that has gotten us in <u>this financial pickle which in a sense you and [Employee #1] would on occasion over the years get my expressed anxiety over matters pertaining to our account with you because it was/is our ONLY "financial security" for our future.</u> You never knew what all elsewhere we had dealt with and lost from but morally I would not give up my commitments to others to see that with my leadership the goals of certain museum-like projects (including Ali Center) would be achieved! Like you, I am a strange breed. There's not a peer of mine in my profession who would have done what we have in walking the talk at our great personal sacrifice. <u>That is why at this time in our lives, both 70 and [Individual #8's wife] bedridden, it is so HUGELY meaningful if you really believe a radical reinvestment of our only lives' savings could without risk realize the kind of returns over the next two years. For us, it would be nothing less than miraculous.  And knowing now more than you ever would wish to about us I am sure, you better appreciate why so conservative and gun shy we have been with the funds you have managed as that is it beyond what we recently sent you to invest at 15%.  However many years the two of us have to yet live, to do so with financial security of the likes we spoke about yesterday in two years time would be indescribable, truly unbelievable.</u>
>
> Thanks for letting me ramble. Got to now get ready for my therapy sessions!
> Fondly,
>
> Individual #8
> Sent from my iPhone

It is clear from the email above that **BENNETT** has knowingly solicited Individual #8's entire

life's savings and promised him a guaranteed rate of return of 15% without risk.  Individual #8



has also made clear that he is relying on this savings to provide for the care of a sick spouse and

he desires to invest in a very conservative fashion.

21.     A review of emails produced by Microsoft following the May 20, 2016, search

warrant found substantial evidence that **BENNETT** and Employee #1 utilized email to

communicate with each other in the execution of the scheme.  **BENNETT** frequently asked

Employee #1 to perform administrative or record keeping tasks as shown in the email below in

which **BENNETT** forwards a link to a signed promissory note from a victim investor identified

as Individual #13, a 61 year old man from South Carolina, with instructions to print it off:

> *From: Dawn Bennett <DBENNETT@DJBENNETT.COM>*
> *To: Employee #1*
> *Subject: IMPORTANT for Employee #1!!!!!!FW: Note*
> *Date: Sat Mar 05 2016 14:22:47 EST*
>
> *[Employee #1]...please print this off...thanks!*
>
> *From: Individual #13*
> *Sent: Friday, March 04, 2016 4:12 PM*
> *To: Dawn Bennett*
> *Subject: Re: Note*
>
> *Sorry...thought it was attached last night*
>
> *Dawn- to be clear, this is due no later than April 20th. The reference to 3 months from the signed document apparently assumes the doc was signed Jan 20th at the due date of the prior note, but is confusing superfluous language. Please confirm that the note will be paid April 20, 2016.*
>
> *Individual #13*

22.     Employee #1 was also frequently a party to victim investor communications with

and without **BENNETT**.  This can be illustrated in the email below, where Individual #11,

communicates with **BENNETT** and Employee #1 using email, to confirm the wire transfer of his

investment:

> *From: Individual #11*
> *To: Dawn Bennett <DBENNETT@DJBENNETT.COM>;  Employee #1*
> *Subject: Re: Wire Instructions for DJBennett.com*
> *Date: Fri Jan 22 2016 15:26:23 EST*
>
> *Dawn and [Employee #1],*

14



*The funds for my nine month promissory note have been wired. Please let me know when the funds have been received and will look for the note also.*

*Thanks.*
*~Individual #11*

## FINDINGS FROM DECEMBER 19, 2016, EMAIL SEARCH WARRANT

23.     A review of the records produced by Microsoft Corporation pursuant to a

December 19, 2016, search warrant covering DBENNETT@DJBENNETT.COM and

<Employee #1>@DJBENNETT.COM found that **BENNETT** was still using

DBENNETT@DJBENNETT.COM to communicate with her victim investors.  For example,

Individual #14, a 48 year old man from Virginia, who had invested $3,050,000 in

DJBennett.com as of December 8, 2016, received the following email from **BENNETT** detailing

his existing investment and a proposed new investment:

*From: Dawn Bennett < DBENNETT@DJBENNETT.COM>*
*To: Individual #14*
*Date: Tue Dec 13 2016 15:25:08 EST*
*Attachments: Individual #14 Prom note 170 days 6-1-17 unsigned.pdf, Individual #14 Prom note 8 mo 6-23-17 unsigned.pdf*

*Subject: As per our conversation:*

*Individual #14,*

*As per our conversation:*

*1st point) : Attached is the "takeover" promissory note at 15% of which matures on June 1, 2017. Please sign, and email me the fully codified document. The interest on that note commences on Wednesday, December 14, 2016.*

*2nd point) : As per Dawn Bennett 100% owner of DJbennett.com ...at the time we open DJBennett.com up for private equity ownership the full and entire dollar amount Individual #14 rolls over into DJBennett.com will increase an automatic increase in ownership of 25% additional which will be an enhancement from the other promissory note holders calculation of ownership. (Once the "takeover" promissory funds have been wired to DJBennett then this agreement commences as well as a formal legal agreement between Individual #14, Bennett and DJbennett.com will be presented to Individual #14 for his approval and signature within a week of the funds being received)*

*3rd point) : At any point, in 2017, Individual #14's total promissory note holdings have the right to pay out earned interest on a monthly basis, or on a quarterly basis or after the end of the full term of 9 months or maturity as per Individual #14's early liquidation request.*

*4th point) : Please see attached promissory note @ 15% rolled over for the full maturity or until Individual #14 requires liquidity.*

15



*5th point) : Wiring Instructions: (Individual #14, Please note that these are new wiring instructions as our old bank, Monument Bank, was bought out by Revere Bank. Revere Bank is a local bank that does not have the technological ability to wire directly or receive overseas funds as well as their online/statements/accounting/wiring process is antiquated. Therefore, I made the decision to move our business account from Monument/Revere to a much more sophisticated bank that can handle wires to and from China and, in general, Asia.) Please see wire instruction below for Eaglebank:*

*Wiring Instructions:*

*Eaglebank*
*7815 Woodmont Ave.*
*Bethesda, MD 20850*
*301-657-7800*

*Please provide your financial institution with following information:*
*Wire Amount: (EXAMPLE) $1,000,000.00 (One Million Dollars and zero cents)*

*Bank Address:*
*Eaglebank*
*7815 Woodmont Ave.*
*Bethesda, MD 20850*

*ABA/Routing Number: 055003298*
*Account Number: XXXXX2656*
*Account Name: DJB Holding, LLC*
*Account Holder's Address: [omitted]*

*Dawn J. Bennett, CEO*
*[address and contact numbers omitted]*
*Website: www.djbennett.com*

Of note is **BENNETT**'s second point in which she implies that DJBennett.com will receive

private equity investment in the future. **BENNETT** also seems to be promising Individual #14

that he will receive a special benefit for participating in a "takeover" promissory note

investment. This benefit appears to be a preferential ownership/equity calculation for

DJBennett.com following the alluded-to private equity investment, presumably to minimize the

dilution of his new investment. A review of the attachments to the email above found an

unsigned promissory note in Individual #14's name for a principal amount of $1,000,000 with a

maturity date of June 1, 2017, as referenced by **BENNETT** in her first point.

    24.    Bank records obtained from Eaglebank for account XXXXX2656 ("EB 2656")

showed that EB 2656 was opened on June 19, 2015, in the name DJB Holdings LLC with

**BENNETT** as the sole signer. A review of the account statement for EB 2656 for December

16



2016, found that Individual #14 wired $1,000,000 to DJB Holdings LLC as directed by **BENNETT** in the email above. I believe this wire was for Individual #14's "takeover" promissory note.

### ADDITIONAL FUNDS TRACING

25.     Individual #17 is a resident of the Commonwealth of Virginia who has known **BENNETT** for decades. In exchange for comparable sums of money, Individual #17 received from **BENNETT** certain promissory or convertible notes in principal amounts of $87,000; $72,640; $173,961.97; $225,311.45, and $150,000 totaling over $700,000. These notes were in relation to the following wire transfers from Individual #17 (or her husband) to Bennett: $150,000 on or about May 5, 2015; $156,370 and $202,527 on or about March 7, 2016; $72,640 on or about June 8, 2016; and $87,000 on or about September 16, 2016.

26.     Prior to receiving the $150,000 wire transfer from Individual #17 on May 5, 2015, the balance in DJB Holdings' FRB 2861 account was approximately $118. The FRB 2861 account was the primary business bank account being utilized by DJB Holdings at that time. The day after receiving the $150,000 wire transfer, **BENNETT** sent a $60,000 wire transfer to her UB 2054 account, of which $49,000 was used to pay her personal condominium fees on May 12, 2015 and $8,106 of which went to pay the mortgage on **BENNETT**'s Chevy Chase residence on May 13, 2015.

27.     Prior to receiving the $156,370 and $202,527 wire transfers from Individual #17 and her husband on March 7, 2016, the balance in **BENNETT**'s account was approximately $3,547. The same day she received the funds, **BENNETT** sent a $175,000 wire transfer to her MB 2660 account, of which $148,500 was transferred (the same day) to the BGFS UB 7427 account. Two days later, **BENNETT** paid off, in full, a BGFS United Bank loan that dated back



to July 2013, with a $148,251 debit transaction. A review of United Bank records found that at least $100,000 from the proceeds of the July 2013 BGFS loan went to pay **BENNETT**'s luxury suite lease with the Dallas Cowboys. On March 7, 2016, **BENNETT** made an American Express payment of approximately $55,760; the majority of expenses on that American Express account were personal in nature, including a $29,715 expense from Astrological Gem in Fairfield, Iowa and an $11,400 expense from Puja.net in Washington State. According to its website, Astrological Gem specializes in providing top quality natural gemstones for Vedic astrology. Puja.net provides clients with "yagyas", which can be described as Hindu ritual blessings or curses performed by priests in India on behalf of Puja.net's clients. On March 11, 2016, **BENNETT** sent a $25,000 wire transfer to Law Firm #4. On March 16, 2016, **BENNETT** sent a $5,625 wire transfer to Individual #12.

28.    Prior to receiving the $72,640 wire transfer from Individual #17 on June 8, 2016, the balance in **BENNETT**'s account was approximately $37,955. On June 9, 2016, **BENNETT** sent a $72,664 wire transfer to an entity from which she had obtained a loan.

29.    Prior to receiving the $87,000 wire transfer from Individual #17 and her husband on September 16, 2016 (a Friday), the balance in **BENNETT**'s account was approximately $41,026. The same day she received the funds, **BENNETT** also received a wire transfer of $150,000 from Individual #16. On September 19, 2016 (a Monday), **BENNETT** sent a wire transfer of $154,707 to Individual #21 and her husband, who I believe are victim investors. On September 21, 2016, **BENNETT** sent a wire transfer of $54,026 to Individual #22, a 60 year old man from West Virginia, who I believe is a victim investor.



## THE EAGLEBANK LOAN

30.     On May 19, 2015, Eaglebank extended DJB Holdings LLC a $750,000 line of credit secured by the inventory of DJB Holdings LLC/DJBennett.com.  Initially, only $250,000 was made available to be drawn on by **BENNETT**.  The remaining $500,000 was subject to an inventory audit and verification of **BENNETT**'s statement to Eaglebank that her Western International brokerage accounts had between $4 million and $5 million in unencumbered liquid assets.  On May 21, 2017, **BENNETT** represented to Eaglebank that she did not have access to her personal brokerage statements, and stated that Employee #1 was the only one who did but he was camping for four days with poor cell phone coverage.  On May 26, 2015, Employee #1 sent the following email to a Vice President at Eaglebank:

> *From: Employee #1*
> *To: LR@eaglebankcorp.com*
>
> *Subject: Request of statement*
>
> *Good morning! I hope you had a great long weekend. I enjoyed my four day hike!*
> *Dawn asked me to send you her most recent complete brokerage account statement, which is March 31, 2015. The next statement will be June 30, 2015.*
>
> *I have not heard back from the building yet and I will follow up with them this morning.*
> *Let me know if you need anything else.*
>
> *Thank you!*
> *Employee#1, CFO*

Attached to the above email was a Western International account statement for the statement period, February 28, 2015 to March 31, 2015, for a brokerage account in **BENNETT**'s name ending 4BF8 ("WST 4BF8") which showed a net portfolio value of $4,209,741.55.  In reality, records provided by Western International showed a net portfolio value of only $35.24 for WST 4BF8.

31.     Further review of the records produced by Microsoft Corporation pursuant to the December 19, 2016, search warrant found the email chain below, where on December 5, 2016,



BENNETT forwarded an old email chain to Employee #1 containing DJBennett.com financial

statements that were to be forwarded to Eaglebank in response to an inquiry related to the

$750,000 line of credit that Eaglebank had extended to DJB Holdings LLC/DJBennett.com in

May 2015:

> *From: Dawn Bennett <DBENNETT@DJBENNETT.COM>*
> *To: Employee #1*
> *Subject: FW: follow-up to our meeting*
> *Date: Mon Dec 05 2016 15:52:22 EST*
> *Attachments: DJB Inventory 12-31-2015.xlsx*
> *DJBPROFITANDLOSS.PDF*
> *INVENTORYSIGNOFFSHEET.PDF*
> *DJBBALANCESHEET002*
>
> *From: Employee #1*
> *Sent: Tuesday, January 19, 2016 2:26 PM*
> *To: Dawn Bennett*
> *Subject: Fw: follow-up to our meeting*
> *For L. ...please forward today.*
>
> ---
> *From: L.R.*
> *Sent: Tuesday, January 19, 2016 9:27 AM*
> *To: Dawn Bennett; Employee #1*
> *Cc: J.R.; J.L.; L.S.R.*
> *Subject: RE: follow-up to our meeting*
>
> *Dawn, Employee #1, good morning. I do not recall getting any responses from you regarding the items below.*
> *Please advise on the status of these items urgently. Thanks.*
>
> *L.R.*
> *EagleBank, Relationships F\*I\*R\*S\*T*
> *VP, Relationship Manager*
> *2001 K Street NW*
> *Washington, DC 20006*
> *Office: 202-331-XXXX*
> *Fax: 202-292-1652*
> *LR@eaglebankcorp.com*

A review of the attachments to this December 5, 2016, email found a year-end balance sheet for

DJBennett.com for 2015.  This balance sheet is shown below:



| | 6/30/2015 | 9/30/2015 | 12/31/2015 |
|---|---|---|---|
| **ASSETS** | | | |
| **Current Assets** | | | |
| **Checking/Savings** | | | |
| Bank Accounts | 55,745.59 | 19,143.52 | 54,033.53 |
| **Total Checking/Savings** | 55,745.59 | 19,143.52 | 54,033.53 |
| | | | |
| **Total Current Assets** | 55,745.59 | 19,143.52 | 54,033.53 |
| | | | |
| **Fixed Assets** | | | |
| Furniture and Equipment | 71,125.00 | 378,945.65 | 541,246.15 |
| Leasehold Improvements | 0.00 | 52,805.47 | 251,001.01 |
| **Total Fixed Assets** | 71,125.00 | 431,751.12 | 792,246.16 |
| | | | |
| **Other Assets** | | | |
| Inventory (Including China) | 4,545,982.71 | 4,585,270.20 | 4,567,967.94 |
| Security Deposit | 2,830.00 | 2,830.00 | 2,830.00 |
| **Total Other Assets** | 4,548,812.71 | 4,588,100.20 | 4,570,797.94 |
| | | | |
| **TOTAL ASSETS** | 4,675,683.30 | 5,038,994.84 | 5,417,077.63 |
| | | | |
| **LIABILITIES & EQUITY** | | | |
| **Liabilities** | | | |
| **Current Liabilities** | | | |
| **Accounts Payable** | | | |
| Accounts Payable | 4,102.00 | 118,456.12 | 12,457.00 |
| **Total Accounts Payable** | 4,102.00 | 118,456.12 | 12,457.00 |
| | | | |
| **Lines of Credit** | | | |
| Eagle Bank | 745,000.00 | 745,000.00 | 750,000.00 |
| **Total Credit Cards** | 745,000.00 | 745,000.00 | 750,000.00 |
| | | | |
| **Total Current Liabilities** | 749,102.00 | 863,456.12 | 762,457.00 |
| | | | |
| **Long Term Liabilities** | | | |
| **Total Long Term Liabilities** | 0.00 | 0.00 | 0.00 |
| | | | |
| **Total Liabilities** | 749,102.00 | 863,456.12 | 762,457.00 |
| | | | |
| **Equity** | | | |
| Retained Earnings | -11,523,542.82 | -11,523,542.82 | -11,523,542.82 |
| Net Income | 450,124.12 | 699,081.54 | 1,178,163.45 |
| Dawn's Ownership Equity | 15,000,000.00 | 15,000,000.00 | 15,000,000.00 |
| **Total Equity** | 3,926,581.30 | 4,175,538.72 | 4,654,620.63 |
| | | | |
| **TOTAL LIABILITIES & EQUITY** | 4,675,683.30 | 5,038,994.84 | 5,417,077.63 |

The balance sheet includes a Liabilities section which lists Total Liabilities of $762,457.00 on December 31, 2015, consisting of the $750,000 Eaglebank line of credit and accounts payable of $12,457.00. Omitted from this balance sheet are the outstanding promissory notes issued to the victim investors. These notes specifically stated that they were guaranteed by the assets of DJBennett.com. On December 31, 2015, the outstanding principal on the notes, not including interest due, would have been over $5,000,000, and certainly should have been included on the DJBennett.com balance sheet. Based on your Affiant's training, knowledge, and experience,

- 21 -



your Affiant believes these notes were deliberately not included in the balance sheet to hide the true financial position of DJBennett.com.

32.     Subsequently, Eaglebank declared DJBennett.com in default on February 18, 2016, in a letter that cited a number of reasons for the default including failure to provide 2014 tax returns, and failure to complete a satisfactory inventory collateral audit.  In the email below, sent on October 10, 2016, **BENNETT** claimed to be unaware of the default and stated that she had been in China for the preceding eight months:

> *From: Dawn Bennett <DBENNETT@DJBENNETT.COM>*
> *To: J.L. <JL@eaglebankcorp.com>*
> *Cc: Employee #1*
> *Subject: RE: Remaining balance on loan #7200119268*
> *Date: Mon Oct 10 2016 06:42:52 EDT*
>
> *J.,*
> *This is very troubling to me...*
> *First, I was in China for the last 8 months so I never received this letter?*
> *More importantly and as a matter of fact, we sent everything L.R. requested at the face to face meeting*
> *via regular mail to him before I left the country thus we would never have anticipated that our credit line*
> *would have been accelerated to be paid off!*
>
> *Something is not right.*
>
> *Dawn J. Bennett, CEO*
> *[address and contact numbers omitted]*
> *Website: www.djbennett.com*
>
> *From: J.L. [mailto:JL@eaglebankcorp.com]*
> *Sent: Thursday, September 29, 2016 9:50 AM*
> *To: Dawn Bennett*
> *Cc: Employee #1*
> *Subject: RE: Remaining balance on loan #7200119268*
>
> *Dawn, The line was defaulted and accelerated months ago (see attached). We had to hire an attorney*
> *because there was no response from you or your attorney and the line was not paid in full when*
> *requested. The additional interest is default interest which is addressed in the letter.*
>
> *Thanks.*
>
> *J.L.*
> *EagleBank, Relationships F•I•R•S•T*
> *SVP, Special Assets Group Manager*
> *[address and contact numbers omitted]*



A search of FBI databases was unable to confirm any international travel for **BENNETT** during the time period in which she claimed to be in China, and a review of records provided for **BENNETT**'s personal American Express card (account ending 97002) during the time period show numerous transactions at restaurants in the Chevy Chase, Maryland, and Washington D.C. area, in which **BENNETT** lives and works.

### Individual #15

33.     Consistent with the fraud scheme, **BENNETT** began paying off the maxed out $750,000 line of credit on June 30, 2016, with a payment of $199,000 which was funded by Individual #15, a 70 year old man from Florida. The circumstances surrounding Individual #15's deposit are as follows. On June 28, 2016, the DJBennett.com operating account (at the time MB 2678) had a balance of $13,299.47. On June 29, 2016, MB 2678 received a wire in the amount of $775,000 from Individual #15, after which the following withdrawals were made:

| DATE | TRANSACTION | AMOUNT ($) |
|------|-------------|------------|
| 6/29/2016 | BENE: INDIVIDUAL #3 TRN:P201606290006812 | (311,292) |
| 6/29/2016 | BENE:Law Firm #1 TRN:P201606290019296 | (11,694) |
| 6/29/2016 | TO DAWN BENNETT ACCOUNT | (40,000) |
| 6/30/2016 | BENE:DJB HOLDING, LLC TRN:P201606300005483 | (200,000) |

Consistent with Ponzi scheme activity, an earlier victim investor, Individual #3, was repaid with interest using the proceeds from a later victim investor, Individual #15. **BENNETT** also continued to use victim investor funds to pay her personal legal expenses as seen with the $11,694 wire to Law Firm #1 previously identified as representing **BENNETT** in the FINRA investigation. The $40,000 withdrawal was a transfer to a personal account held in **BENNETT**'s



name at Monument Bank ending 2660 ("MB 2660"). On the same day of the $40,000 transfer,

**BENNETT** wired $15,000 from MB 2660 (which had a balance of $350.70 prior to the $40,000

transfer) to United Bank to pay the mortgage on her primary residence, a penthouse

condominium located in Chevy Chase, Maryland. Also on June 29, 2016, **BENNETT** wired

$24,000 to a business account at United Bank ending 7427 ("UB 7427") in the name Bennett

Group Financial Services LLC. UB 7427 was overdrawn by $250.28 prior to this $24,000 wire,

which went on to fund a payroll debit for employee garnishment in the amount of $12,297.14 on

June 30, 2016. Lastly, on June 30, 2016, the day after Individual #15's $775,000 investment,

$200,000 is wired from MB 2678 to EB 2656, the DJB Holdings LLC operating account at

Eaglebank. On the same day $199,000 is transferred to the Eaglebank loan account discussed

above to begin the loan default payback process.

34.    A search of the records produced by Microsoft Corporation pursuant to the

December 19, 2016, search warrant found emails relating to Individual #15's investment. The

email below from Individual #15 to **BENNETT** dated August 23, 2016, lays out the background

for his initial $775,000 investment while requesting a return of his funds:

> *From: Individual #15*
> *To: Dawn Bennett <DBENNETT@DJBENNETT.COM>*
> *Subject: INVESTMENT RETURN*
> *Date: Tue Aug 23 2016 07:20:34 EDT*
>
> *Dawn,*
>
> *I want to reiterate that I am requesting a full return of the total of $775,000 that I invested in your company, DJBennett, on June 27th for the stipulated brief period of two months, with a written guarantee of 15% interest to be paid at the end of that period.*
>
> *I was offered an opportunity to keep the money in your company beyond this time, but I have verbally, and now in writing, made it clear to you that I want all of this money returned to me by this Friday, August 26th.*
>
> *I have shared with you on numerous occasions that this money was withdrawn from my retirement IRA under the IRS policy of being free of any tax liability if fully returned*

- 24 -



*within 60 days of withdrawal. That date is this Friday. As you know, this money constitutes nearly all of my net worth.*

*I ask that you exhaust whatever means are necessary to meet this request by the time requested. Failure to do so will cause me a very substantial financial penalty. There is no other solution that will serve as an alternative. I will waive the promised interest money of approximately $20,000 if you deliver this money by the requested date.*

*Please update me this morning on your plan for meeting this request.*

*Individual #15*

On September 21, 2016, Individual #15 sent the email below, apparently after having received a partial repayment of his initial investment and having received resistance from **BENNETT** in getting full repayment:

*From: Individual #15*
*To: Dawn Bennett <DBENNETT@DJBENNETT.COM>*
*Subject: Fwd: RETURN OF INVESTMENT*
*Date: Wed Sep 21 2016 08:52:08 EDT*

*Dawn,*

*I just heard your voicemail about being unable to receive emails for several days. That is unfortunate as you seemingly have no read this email which is now three days further into the escalating problem.*

*You mentioned getting my money back by the end of the month. I don't know what I have to do or say to help you understand my emphatic need to resolve this problem now. I need an update today by email as to when you will have this money back to me.*

*What a regrettable experience this has been.*
*Individual #15*

*> Begin forwarded message:*
*>*
*> From: Individual #15*
*> Subject: RETURN OF INVESTMENT*
*> Date: September 19, 2016 at 18:29:15 EDT*
*> To: Dawn Bennett < DBENNETT@DJBENNETT.COM>*
*>*
*> Dawn,*
*> It is now one month from my first written request to have my all of my investment in your company, DJBennett, returned to me, and 25 days from the receipt of the first payment*
*> of that total of $825,000 in the amount of $400,000 on August 26th four days after clear request to meet the two month deadline for return of the withdrawal.*
*>*
*> I have stated to you verbally many times, and most recently in person and by email 10 days ago, that I am requesting the return of the entire balance of my investment, plus interest, approximately $450,000.*
*> I have lost my faith and trust in you, and now doubt your intent to return my investment in any*



*reasonable time. The demonstration of getting half the money in four days strongly suggests that you have intentionally withheld*
*> the return of this investment. You have offered continual reasons to convince me to leave my investment in place, and maintain a stake in your company, but I repeatedly have said no.*
*>*
*> I have also told you repeatedly that I did not want to accept your offer of payment of my entire tax liability for this year in exchange for leaving my money with your company.*
*> The stress continues to build of being now well outside the window of 2 months to return the withdrawal without penalty, as I have never been investigated by the IRS and never want to put myself in that situation.*
*> I do not want to resort to legal means to obtain these funds, but your lack of assistance in this matter is leaving me no choice.*
*> I ask you to use the same mechanisms and favors that were able to obtain the initial $400,000 in just four days again now, and that the entire amount be returned by tomorrow.*
*> I regret how this has ended, but I do not want any further communication with you except notice that the funds have been deposited in my Wells Fargo account.*
*> Individual #15*

Consistent with the Ponzi scheme, Individual #15 was repaid with a combination of later victim

investor funds, much of which came from Individual #14.

## EARLY 2017 DEVELOPMENTS

35.     On March 9, 2017, **BENNETT** (as guarantor) and DJB Holdings LLC (as

borrower) closed on a $4,300,000 loan with an entity, Lender #1, based in White Plains, New

York. A review of the loan agreement provided by Lender #1 found that the proceeds of this

loan were to be used only for 1) the purchase of a named privately-held consumer products

company, 2) the funding of a tax lien reserve in the amount of $350,000, and 3) the payment of

fees, costs and expenses connected to the closing of the loan. The loan agreement further stated

that the loan was to be secured by fine art collateral owned by **BENNETT**, specifically two

identified pieces of art which were to be stored and controlled by a third party until the loan was

satisfied. On March 8, 2017, the date preceding the loan closing, the balance in EB 2656 (which

remains the current operating account for DJB Holdings LLC) was $606.45. In addition, an

ACH payment to a short-term factor lender in the amount of $33,995.00 was returned for

insufficient funds. On March 9, 2017, the proceeds of the Lender #1 loan were disbursed to EB



2656 in the amount of $3,137,669.32. During the first week following this cash infusion, the following payments were made from EB 2656:

| Date | Transaction | Amount ($) |
|------|-------------|-----------:|
| 3/9/2017 | Outgoing wire transfer to Individual #16 | (170,000.00) |
| 3/9/2017 | Outgoing wire transfer to Individuals #17 and #18 | (80,812.00) |
| 3/10/2017 | Outgoing wire transfer to Individual #14 | (1,062,500.00) |
| 3/10/2017 | Outgoing wire transfer to CLPF-CC Pavilion LP | (350,000.00) |
| 3/10/2017 | Outgoing wire transfer to Dawn J. Bennett, United Bank | (200,000.00) |
| 3/10/2017 | Outgoing wire transfer to Individual #11 | (179,550.00) |
| 3/13/2017 | Outgoing wire transfer to GMA USA LLC | (150,000.00) |
| 3/13/2017 | Outgoing wire transfer to Law Firm #4 | (25,000.00) |
| 3/13/2017 | ACH payment to American Express | (115,937.65) |
| 3/13/2017 | ACH payment to Chase credit card | (24,326.52) |
| 3/13/2017 | ACH payment to American Express | (24,071.32) |
| 3/14/2017 | Outgoing wire transfer to Law Firm #5 | (7,751.50) |
| 3/14/2017 | ACH payment to American Express | (21,768.28) |
| 3/14/2017 | ACH payment to American Express | (10,664.44) |
| 3/15/2017 | Outgoing wire transfer to Attorney #2 | (19,235.00) |
| 3/15/2017 | Outgoing wire transfer to Individual #19 | (15,000.00) |
| 3/16/2017 | ACH payment to American Express | (43,203.76) |
| 3/16/2017 | ACH payment to Barclaycard | (5,000.00) |
|  | **Total** | **(2,504,820.47)** |

The individuals identified by number in the table above have all been confirmed to be victims. CLPF-CC Pavilion LP is the property owner for the BGFS office space (a portion of which is utilized by DJBennett.com) in Washington, D.C. Based on the review of records provided by CLPF-CC Pavilion LP, I know that BGFS had fallen behind on its monthly lease payments, and this $350,000 payment was needed to bring them current. The $200,000 wire to **BENNETT**'s personal account ending 2054 at United Bank ("UB 2054") was used to fund a $31,000 payment to **BENNETT**'s mortgage and home equity line of credit accounts at United Bank. The balance

- 27 -

in UB 2054 prior to the $200,000 wire was $734.24. I know GMA USA LLC to be a firm which specializes in what they term "merchant cash advances," which I believe to be another form of short-term lending in which DJBennett.com has engaged, again symptomatic of a company experiencing extreme financial duress. As previously discussed, Law Firm #4 is a law firm that **BENNETT** has used during the course of her litigation with FINRA and the SEC. Investigation to date has shown that **BENNETT** has used credit cards, such as American Express, Chase, and Barclaycard, for a mix of personal and business expenses. It is therefore likely that a significant portion of these payments went to personal expenses benefiting **BENNETT**. I know Law Firm #5 to be a large multi-national law firm with offices in Washington D.C. I know Attorney #2 to be an attorney that represented **BENNETT** and DJB Holdings LLC in a lawsuit **BENNETT** and DJB Holdings LLC filed against Google in the United States District Court for the District of Columbia alleging defamation, tortious interference, and intentional infliction of emotional distress. *See Bennett et al v. Google, Inc.* (case no. 16-cv-2283, D. D.C. filed November 11, 2016). This lawsuit was filed in November 2016 and was dismissed on June 21, 2017.

36.     As of April 19, 2017, the balance in EB 2656 had dropped below $60,000, but an incoming wire for $250,000 from Individual #11 provided additional capital to allow DJBennett.com's continued operation. Records provided by CLPF – CC Pavilion L.P. in July 2017 indicate that BGFS is once again behind on its lease payments, owing $124,670.72 for May 2017 and June 2017 rent and utilities. In addition, records provided by Cowboys Stadium L.P. in July 2017 show that **BENNETT** was facing a potential lawsuit for non-payment of her Cowboys Stadium lease for the 2016 football season. On June 21, 2017, in response to an email sent by the Dallas Cowboys general counsel with the subject "RE: LAST CHANCE - PAYMENT



OWED- PLEASE REPLY- IMPENDING LAWSUIT", **BENNETT** replied with the email

below, again purporting to be out of the country:

> *From: Dawn Bennett [mailto:DBENNETT@DJBENNETT.COM]*
> *Sent: Wednesday, June 21, 2017 1:29 PM*
> *To: J.C.*
> *Subject: RE: LAST CHANCE - PAYMENT OWED- PLEASE REPLY- IMPENDING LAWSUIT*
>
> *J.,*
> *I just tried to call you but was left on hold and then was disconnected.*
> *I just received your last two emails as I am now in Hong Kong but am flying out tomorrow to the US and*
> *will be back in the office late next week to take care of the remaining obligation to you.*
> *What I don't understand ... is that I told you via email that I would be back in the states by June, 2017 ...*
> *and would take care of the remaining amount by the end of the month.*
> *So, I am not sure what changed or did I misunderstand?*
>
> *Please advise.*
>
> *Dawn J. Bennett, CEO*
> *[address and contact numbers omitted]*
> *Website: www.djbennett.com*

**BENNETT** replied again the same day, professing that she had not responded to prior emails

because it was unsafe to access her U.S. email from China:

> *From: Dawn Bennett [mailto:dbennett@djbennett.com]*
> *Sent: Wednesday, June 21, 2017 2:09 PM*
> *To: J.C.*
> *Subject: RE: LAST CHANCE - PAYMENT OWED- PLEASE REPLY - IMPENDING LAWSUIT*
>
> *Goodness Jason ... you know part of my company is in China and I don't have access to my U.S. based*
> *emails there due to hacking and vicious Chinese viruses.*
> *One day ... I hope to be able to get U.S. based emails in China ... but today it still isn't safe.*
> *So, again just know .... I will get you the remaining amount by the end of next week.*
> *And by the way ... I really do appreciate the special attention you give me to help remind me.*
> *Speak with you once I get back.*
> *I need to go to bed .. .it is 3:00am in the morning and I am beat!*
>
> *Dawn J. Bennett, CEO*
> *[address and contact numbers omitted]*
> *Website: www.djbennett.com*

Again, a search of FBI databases for any international travel by **BENNETT** during this time

frame did not locate any record of international travel.  Records provided by Cowboys Stadium



L.P. found that **BENNETT** made the following payments to bring herself current on her luxury

suite lease for the 2016 season:

| Date | Source Bank | Type | Amount ($) |
|------|-------------|------|-----------|
| 8/8/2016 | Monument Bank | Wire Transfer | 50,000 |
| 8/26/2016 | Monument Bank | Wire Transfer | 100,000 |
| 9/22/2016 | Monument Bank | Wire Transfer | 150,000 |
| 12/30/2016 | Eaglebank | Wire Transfer | 100,000 |
| 1/3/2017 | Eaglebank | Wire Transfer | 50,000 |
| 7/3/2017 | Eaglebank | Wire Transfer | 50,000 |

Analysis of the DJBennett.com operating accounts found that these payments were largely

funded by deposits from victim investors Individual #20, Individual #11, and Individual #14.

Because **BENNETT** was delinquent on her lease payments, she was denied use of her leased

suite for the 2014 and 2016 football seasons.  Although she was current for the 2015 football

season, Cowboys Stadium L.P. records show that **BENNETT** did not use her suite at all during

the season.  Lastly, records provided by Cowboys Stadium L.P. show that **BENNETT** is

delinquent on her lease payment of $500,000 for the 2017 football season which was due on

March 1, 2017, and has accrued late fees of $18,750.

### ADDITIONAL INFORMATION REGARDING CONSCIOUSNESS OF GUILT

37.     Pursuant to an additional email search warrant authorized by United States

Magistrate Judge Thomas M. DiGiorlamo on July 18, 2017, I obtained a series of emails

**BENNETT** sent to herself on June 16, 2017, a few days before Employee #1 provided sworn

testimony to the SEC.  Those emails, all sent from **BENNETT** to **BENNETT**, read as follows:

- 30 -



| Time | Subject | Text of Email |
|------|---------|---------------|
| 7:57 p.m. | | Brad I think this is going up uovalot[sic] worse than you expected. If you are bound to do this… it is certain they are going to cone[sic] after you for no good reason but that is not going to stop them. |
| 7:59 p.m. | | They are going to goad you into something that isn't true that works save your skin. |
| 8:15 p.m. | | Be nice but confused<br>Be nice but be incompetent |
| 8:17 p.m. | | Be a little incompetent . A little confused |
| 8:58 p.m. | You need to plead temporary insanity | What you did makes no sense |

38.     On June 16, 2017, at 6:36 p.m., approximately an hour before **BENNETT** sent herself the first email, Employee #1 called **BENNETT**. That call lasted approximately 18 minutes. From these emails, it appears that **BENNETT** is emailing herself notes about coaching Employee #1 for Employee #1's upcoming SEC testimony.

39.     On June 17, 2017, the Saturday prior to Employee #1's testimony on Monday, **BENNETT** had approximately 18 phone contacts with Employee #1 ranging in duration from one minute to 29 minutes.  On June 18, 2017, **BENNETT** had two phone contacts totaling 32 minutes with Employee #1.

40.     On June 19, 2017, Employee #1 provided sworn testimony to the SEC. **BENNETT** had three phone contacts with Employee #1 between 12:06pm and 12:22pm, presumably during the lunch break. Law Firm #6 represented Employee #1 during the proceeding. Based on my review of the records, I believe that **BENNETT** paid for Law Firm #6 to represent Employee #1. On June 16, 2017, a $5,000 wire transfer was sent from **BENNETT's** UB 2054 account to Law Firm #6.  On June 15, 2017, the day before that wire transfer was



made, **BENNETT** deposited a $5,000 personal check from Individual #23, a presumed victim investor, made payable to "DJ Bennett" into **BENNETT**'s UB 2054 account.

41.     On August 2, 2017, pursuant to a federal search warrant, FBI agents searched **BENNETT**'s residence in Maryland and office in Washington, D.C.

42.     In **BENNETT**'s office space, agents found what appears to be an "excuse list" for a **BENNETT** employee to provide to individuals who called the office.  All callers were to be told **BENNETT** was "out on business travel."  The SEC was to be told **BENNETT** was "out until Sept[ember]."  Individual #14, however, was to be told **BENNETT** was in "New Mexico Probably Coming Back July 10."  Individual #13 was to be told something different, that **BENNETT** "is in Asia getting manufacturing ready 2018 – back end of August."

43.     In **BENNETT**'s residence, agents also found evidence regarding **BENNETT**'s guilt and guilty knowledge.  Records reviewed as part of this investigation indicate that **BENNETT** spent fraud proceeds for various personal expenses. For instance, on November 22, 2016, the DJB Holdings Bank account received a $600,000 wire from Individual #4. Prior to receiving that wire, the account balance was $55,085. On November 23, 2016, **BENNETT** made a payment of $159,399 to American Express. The previous month, **BENNETT** had used this card for a variety of expenses that are seemingly personal in nature, including an $8,306 Anti-Aging & Weight Loss charge, a $10,575 Cengenics Pharmacy charge, a $7,836 charge at the Ritz Carlton – South Beach, and a $7,423 charge at Saks Fifth Avenue.  In **BENNETT'S** Chevy Chase penthouse, agents found a wealth of personal effects demonstrative of her lifestyle.  A photograph of some of the personal effects is below:





44.     Also in the search of **BENNETT**'s residence, agents recovered instructions for

placing individuals under a "hoodoo spell," which based on open source investigation I

understand to be synonymous with a "voodoo spell." The instructions were called "Beef Tongue

Shut Up Hoodoo Spell" and allegedly were to cause the individuals under spell to "shut up"

about **BENNETT**. In handwritten notes on DAWN J. **BENNETT**-styled stationary, along with

other directions such as slitting open animal tongue, the instructions called on the spell-caster to

state the name of the individual on whom to cast the spell followed by "I cross and cover you[,]

come under my command[.] I command you to hold your tongue." The residential search also

uncovered biographical information for at least three SEC attorneys working on the SEC

investigation into **BENNETT**. Consistent with the instructions on how to cast a "hoodoo spell,"

agents discovered in **BENNETT**'s residence two freezers containing dozens of sealed Mason

jars with identifying information for the same SEC attorneys, suggesting that **BENNETT** had

many times cast a "hoodoo spell" in hopes of paranormally silencing the SEC attorneys

investigating **BENNETT**. Photographs of the freezers' contents are included below, with many

of the sealed containers visible complete with the initials of SEC attorneys written on the lids:





## CONCLUSION

45.     Based on the facts set forth herein, I respectfully submit that there is probable

cause to believe that **BENNETT** has committed violations of 18 U.S.C. § 1343, 1344, and 1014.

Therefore, I request the issuance of a criminal complaint and an arrest warrant.

46.     Your Affiant has signed this document under oath as to all assertions and

allegations contained herein and states that its contents are true and correct to the best of his

knowledge.

Keith A. Custer, Special Agent
Federal Bureau of Investigation
Department of Justice

Subscribed and sworn to me on this _____ day of August, 2017.

Charles B. Day
United States Magistrate Judge
District of Maryland

36



AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Maryland

United States of America
v.
**Dawn J. Bennett**

_____
*Defendant*

)
)
)
)
)
)

Case No. 17-2292-CBD

17mj2217

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   **Dawn J. Bennett** _____ ,
who is accused of an offense or violation based on the following document filed with the court:

❑ Indictment     ❑ Superseding Indictment     ❑ Information     ❑ Superseding Information     ☑ Complaint
❑ Probation Violation Petition     ❑ Supervised Release Violation Petition     ❑ Violation Notice     ❑ Order of the Court

This offense is briefly described as follows:

18 USC § 1343; § 1344; § 1014 - Violations including Wire Fraud, Bank Fraud and False Statements in Relation to Loan
and Credit Application.

Date:  Aug 24, 2017                                       *Issuing officer's signature*

City and state:     Greenbelt, Maryland                  Charles B. Day, United States Magistrate Judge
                                                          *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                                      _____ *Arresting officer's signature*  _____ *Printed name and title* |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. 17-2292-CBD |
| | * | |
| DAWN J. BENNETT, | * | |
| | * | |
| Defendant | * | 17mj2217 |
| | * | |
| | * | |

### MOTION TO SEAL

The United States of America, by its attorneys, Stephen M. Schenning, Acting United States Attorney for the District of Maryland and Erin B. Pulice and Thomas P. Windom, Assistant United States Attorneys for said District, hereby moves this Honorable Court for an order sealing the Criminal Complaint, Affidavit and Arrest Warrant in the above-captioned matter.   Disclosure of the Criminal Complaint would enable the defendant to evade her appearance before the Court.

**WHEREFORE**, the government requests that this Motion, the Order and all other documents filed in this action be **sealed** until further order of the Court.

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney

By: _Erin B. Pulice_
Erin B. Pulice
Thomas P. Windom
Assistant United States Attorney

**ORDERED** as prayed, this 7th day of August, 2017.

_Charles B. Day_
Charles B. Day
United States Magistrate Judge